UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

—————

FLOYD E. KOHN,

               Plaintiff,              Case No. 2:16-cv-115

v.                                   Honorable Robert Holmes Bell

UNKNOWN ERNST, et al.,

               Defendants.

_____/

## OPINION

        This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Ernst, Bertram, Lacrosse, Anderson, Hough, Connie, McLean, Horton, Woods, Barber, Myers, Seimes, Beavlev, Goings, Brown, Ball, Bassett, Mackie, Theut, Russell, LaLande, Isard, Maki, Lindenmuth, Clark, Richardson, Doolittle, and Patel.

In addition, a careful review of the complaint reveals that Plaintiff's Eighth Amendment failure to protect claims against Defendants Myron, Lancor, Sellick, Payment, Watson, and Dunton, his First Amendment retaliation claims against Defendants Gurnoe, Dunton, Ross, Bigger, Russo, and Pawley, and his Fourteenth Amendment equal protection claims against Defendants Sellick, Hall, Holden and Thomas are not clearly frivolous and may not be dismissed on initial review. Therefore, the Court will serve the complaint against Defendants Myron, Lancor, Sellick, Gurnoe, Payment, Russo, Holden, Thomas, Watson, Ross, Pawley, Bigger, Dunton, and Hall.

## Discussion

I.   Factual allegations

Plaintiff Floyd E. Kohn, a Michigan prisoner currently incarcerated at the Ionia Correctional Facility (ICF), filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Corrections Officers Unknown Ernst, Unknown Sellick, Unknown Gurnoe, Unknown Bertram, Unknown Payment, Unknown Anderson, Unknown McLean, Unknown Myers, Unknown Seimes, T. Beavlev, Unknown Goings, Unknown Brown, Unknown Russo, Unknown Ross, Unknown Pawley, B. Hall[1], and Unknown Richardson.

Plaintiff also names Defendants Resident Unit Manager Unknown Lacrosse, Inspector Unknown Hough, Deputy Warden Unknown Connie, Unknown Horton, Warden Jeffrey Woods, Legislative Corrections Ombudsman Keith Barber, Assistant Resident Unit Supervisor K. Holden, Deputy Warden Unknown Bell, Resident Unit Manager Unknown Thomas, Grievance

---

[1] Plaintiff lists this defendant as Corrections Officer Hall on the caption, but names him as Corrections Officer B. Hall in the Parties section of his complaint. However, it appears from the body of the complaint that there is only one defendant with the last name Hall.

Coordinator T. Bassett, Warden Unknown Mackie, Lieutenant Unknown Watson, Sergeant Unknown Bigger, Assistant Resident Unit Supervisor Unknown Dunton, School Building Administrator Unknown Theut, Grievance Director Richard D. Russell, Resident Unit Manager Unknown LaLonde, Deputy Warden Unknown Isard, Hearing Officer Unknown Maki, Sergeant Unknown Myron, Counselor Unknown Lancor, Resident Unit Manager Unknown Lindenmuth, Assistant Resident Unit Supervisor Unknown Clark, Nurse Unknown Doolittle, and Psychiatrist Unknown Patel.

Plaintiff's complaint consists of thirty-two handwritten pages, which are sometimes difficult to decipher, and is made up of disjointed and unclear descriptions of the alleged violations of his rights by the named Defendants.  Plaintiff also offers three-hundred and seventy-seven pages of exhibits, including copies of grievances, grievance responses, misconduct records, and other prison records.  After a careful review of the complaint and attached exhibits, the Court concludes that Plaintiff's complaint is subject to partial dismissal for failure to state a claim.

In Plaintiff's complaint, he alleges that while he was confined at the Alger Correctional Facility (LMF), Defendants Myron, Lancor, and Lindenmuth bought two bras and told Plaintiff to wear them or be sent to segregation.  Defendant Myron called Plaintiff a "faggot ass bitch" and an abomination, claimed to have spit in Plaintiff's food trays, and told Plaintiff that his mother should be dead for having given birth to him.  Plaintiff states that his mother had been murdered in 2006, and the harassment he was subjected to brought him to tears on several occasions. Plaintiff also claims that Defendant Myron wrote numerous false tickets on him, and that Defendant Maki found him guilty despite the lack of any evidence.

Plaintiff also claims that Defendant Lancor refused Plaintiff's requests to be moved out of a cell with inmate Simms, who was openly hostile to Plaintiff. Simms told Plaintiff that he had been given a pack of cigarettes by Defendant Myron and that Simms had received three and a half years for beating a previous cell mate with a lock in a sock. Plaintiff again asked to be moved and Defendant Lancor said he would help Plaintiff. However, Plaintiff was not moved and on May 19, 2014, inmate Simms attacked Plaintiff. On June 2, 2014, Defendant Myron told Plaintiff that he had gotten what he paid Simms for, saying that it was fun to watch another "butch" beat Plaintiff up and that he might try that again.

Plaintiff alleges that on October 24, 2014, he was placed in a cell that smelled of chemicals or paint. The smell made Plaintiff ill, and he complained to Defendant Gurnoe and Corrections Officer Libby. Plaintiff states that the smell caused him to gag and vomit, and to develop chest pain and a headache. Plaintiff claims that when he touched the wall, he realized that the paint was not dry. Defendant Gurnoe would not give Plaintiff the window opener, saying that Plaintiff deserved to die from the fumes because of all the grievances that Plaintiff had written on Defendant Dunton. Plaintiff states that the nurse gave him ibuprofen, but that he was not allowed any fresh air. Plaintiff was kept in the cell for eleven days and believes that his placement was ordered by Defendant Dunton to punish Plaintiff for filing grievances. Plaintiff further claims that Defendant Gurnoe and Corrections Officer Libby made sexually harassing comments to him regarding his breasts and whether he had female genitalia.

Plaintiff alleges that on January 5, 2015, he experienced chest pains during the night. Plaintiff told Defendant Ernst that because there was not a button he could push to alert staff if he had a heart attack or stroke, he had to get off of the top bunk. Defendant Ernst told Plaintiff that he

-4-

needed to stay on his bunk regardless of his symptoms.  Defendant Ernst wrote a ticket on Plaintiff for being out of place, and the continued with his rounds without summoning medical assistance for Plaintiff.  Plaintiff waited until after count and then went to Defendant Bertram seeking help. Plaintiff was told to walk to the nurse's office.  Plaintiff had to go outside into a blizzard in order to see the nurse.  Plaintiff claims that Defendant Ernst had previously harassed him for being transgender and gay, and had denied Plaintiff use of the restroom on several occasions.

On April 2, 2015, while he was confined at the Chippewa Correctional Facility (URF), Defendant Payment repeatedly called him "sweet tits" and "deep throat master," and told Plaintiff that he had heard that Plaintiff was transgender.  Defendant Payment also told Plaintiff that he had heard that Plaintiff was good at giving oral sex.  Plaintiff told Defendant Payment that he was making him uncomfortable and asked him to stop talking to him in a sexual manner.  However, Defendant Payment continued asking Plaintiff about oral sex, stating that he "might as well get [his] dick sucked too."  Defendant Payment also told another inmate that Plaintiff was a "slutty whore" and a "transgender whore," and to stay away from Plaintiff.  Defendant Payment also said that because Plaintiff had been given breasts, he thought his "shit didn't stink."  At one point, Defendant Payment called Plaintiff to the unit desk and pulled an inmate ID out of his wallet.  Defendant Payment told Plaintiff that the inmate, who was gay, had been transferred, but that he had previously performed sex acts for Defendant Payment and, in return, Defendant Payment did favors for the inmate. Defendant Payment told Plaintiff that he could do the same for him.  Plaintiff continued to refuse Defendant Payment's advances.  Plaintiff filed a grievance on Defendant Payment, but received no help with the problem.

Plaintiff alleges that Defendant Sellick has called him a "fuckin' transgender," and told him that because he did not have the top two buttons done up on his shirt, he was trying to show his "tits" to other inmates.  Defendant Sellick wrote Plaintiff a misconduct ticket for having his shirt partially unbuttoned.  Plaintiff states that he wrote multiple grievances on Defendants Sellick for sexual harassment.

On April 2, 2015, Defendant Payment had Plaintiff moved to Lime Unit and assigned to share a cell with inmate Shelton, who had previously assaulted Plaintiff in 2013 while he was confined at the Kinross Correctional Facility.  Plaintiff had been told that there was a SPON (Special Problem Offender Notice) on inmate Shelton.  Defendant Sellick escorted Plaintiff to his new cell and when Plaintiff arrived there, Defendant Sellick smiled saying, "Do you know Mr. Shelton? He'll be your new cellie."  Defendant Sellick also told Plaintiff that the previous resident of that cell had lost the key, so that Plaintiff would not have a key to his cell, so he could not come and go. Plaintiff told Defendant Sellick that he was afraid to go into the cell and that there was supposed to be a SPON on inmate Shelton.  Defendant Sellick told Plaintiff that she didn't care about any SPON and that if he did not go into the cell, he would receive a class I misconduct ticket.  Plaintiff refused and Defendant Sellick sent him to Defendant Watson, telling Plaintiff to leave his property. Defendant Sellick stated, "You won't have half of it when I go through it!"  Plaintiff did leave his property and Defendant Sellick took two coffee mugs with his name on them, two personal thermals, one state issue button up shirt, a plastic tupperware bowl, one unopened tub of Cheese Velveeta, four popcorns, and two bags of corn chips.  Defendant Theut found Plaintiff guilty of the disobeying a direct order misconduct.

Plaintiff spoke to Defendant Watson, who stated that there was no SPON on inmate Shelton and Plaintiff.  Defendant Watson insisted that Plaintiff go into the cell with inmate Shelton. Plaintiff refused and asked to be taken to segregation for his own protection.  While in segregation, Plaintiff had several meetings with Defendants Dunton and Warden Miller.  Plaintiff states that Defendant Dunton told him on multiple occasions that he should return to the unit with inmate Shelton.  When Plaintiff protested that he had rights under PREA (Prison Rape Elimination Act), Defendant Dunton said that he was not concerned about PREA and that sexual assault was "no big deal."

On May 25, 2015, Defendant Ross refused to allow Plaintiff to use the bathroom when he asked, and Plaintiff had to wait three hours in order to go to the restroom despite the fact that other inmates were allowed to go to the restroom during this time.  Plaintiff wrote a grievance regarding this issue.  Defendant Bigger reviewed the grievance with Plaintiff and told him that he would speak to Defendant Ross if Plaintiff signed off on the grievance.  Plaintiff did so, but Defendant Bigger did not follow through with his promise.  On May 29, 2015, Plaintiff said hello to Defendants Ross and Bigger as he walked by the unit desk.  Defendant Ross told Plaintiff not to say hello to him.  Defendant Ross then turned to Defendant Bigger and stated, "this is the fag that wrote me a grievance about constitutional rights to use the bathroom.  Don't they know they don't have any rights when you come into URF prison gates? I should rip your tongue and piss down your throat!"  Defendant Bigger laughed.  The next day, Plaintiff received a retaliatory ticket falsely asserting that he had his whole body covered up during count.

On May 29, 2015, Defendant Russo prevented Plaintiff from going to chow for his breakfast meal for no apparent reason.  Plaintiff filed a grievance on him, which was thrown away

by Defendant McLean.  On May 31, 2015, Defendant Pawley called Plaintiff to the desk in order

to review a class III ticket with Plaintiff.  The ticket had been written by Defendant Ross, so Plaintiff

asked for Defendant Ross' badge number.  Defendant Pawley stated:

> Don't you fuckin' faggots get it, we make the rules around here Mr.
> Kohn.  Don't you know I can go to your cell and plant all kinds of
> shit in there?  I can plant knives, drugs, razors, whatever I choose to,
> so don't be askin' for badge #s or putting up a fight when it comes to
> these tickets.  I'm next in line to become the Inspector of URF
> Chippewa this whole compound.  I can have you moved to the hole,
> to level 4 indefinitely, for looking at me the wrong fuckin' way.  You
> got me?  I can take all of your personal property and flush it down the
> toilet.

*See* ECF No. 1, PageID.11.  Plaintiff protested that the ticket was in retaliation for a grievance that

Plaintiff had written on Defendant Ross, stating that he had no choice but to file a lawsuit on

Defendant Ross, and to let his attorney question Defendant Ross in court.  Defendant Pawley asked

Plaintiff if he had been calling the PREA (Prison Rape Elimination Act) hotline.  When Plaintiff said

that he had because staff were violating federal law, Defendant Pawley became angry and told

Plaintiff to get out of his unit.  Plaintiff walked away.

Defendant Pawley subsequently wrote a misconduct ticket on Plaintiff for threatening

behavior.  Plaintiff was told that the hole was full and was taken to a unit in level 4.  Plaintiff's

personal property, including Nike shoes and a Dickies coat, was taken at the behest of Defendant

Pawley.  Plaintiff was found "not guilty" of the misconduct on June 3, 2015.

Plaintiff wrote grievances, but Defendant McLean "lost" most of them.  Plaintiff

wrote to Defendant Woods twelve times regarding his PREA issues, as well as to complain of racist

and harassing conduct by staff.  Plaintiff claims that Defendants Ernst, Sellick, Payment, Gurnoe,

and Anderson call black inmates "niggers, jiggaboos, sambos, and porch monkeys."  Defendant

Bigger calls the majority of inmates "fags."  Plaintiff also wrote to Defendant Horton nine times, but received no response.  Plaintiff alleges that Defendant Woods fails to properly supervise his employees and that URF staff "runs amok."  Defendants Beavlev, Hall, Myers, and Lacrosse have all joked with Defendant Woods in the open about how "niggers" should be shipped to their own island.

Plaintiff contends that Defendants Ernst, Bertram, and Bigger openly competed regarding who could write the most tickets on black inmates.  Plaintiff overheard Defendant Ernst tell Defendant Bigger that she would have to do more third shift tickets in Neebish Unit in the coming week because he was going to "hit some niggers with tickets on B and D wing."  Shortly thereafter, Plaintiff heard Defendants Ernst and Bertram talking about all the "fags" in the unit, including Plaintiff, and how Corrections Officer Voltz and Defendant Seimes wished Plaintiff would kill himself.  Plaintiff states that a conspiracy exists at URF and that Corrections Officers, including Defendants Pawley and Payment, plant contraband in the cells of black inmates, tamper with mail and inventory sheets, and spy and stalk homosexuals in the showers and cells.  Defendant Anderson openly talked about doing "meth" on the job.  Plaintiff complains that random drug testing of MDOC employees is nonexistent.

Plaintiff claims that Defendant Russell has failed to resolve any of Plaintiff's numerous grievances.  Plaintiff has also written to Defendant Barber seeking assistance, to no avail. Plaintiff alleges that he wrote grievances on Defendant Hall three times for calling Plaintiff a "fag ass nigger" and telling Plaintiff to go kill himself.  Plaintiff states that Defendant Beavlev joined in the harassment, and called Plaintiff "Mrs. Hotazz."  Plaintiff claims that on one occasion, Defendant

Hall made Plaintiff leave the chow hall as soon as he sat down to eat, telling him that he could "starve" that night.

On June 9, 2015, Plaintiff and inmate Smith did not receive their breakfast or the opportunity to shower.  Finally, at approximately 8:15 a.m., they received a breakfast tray which contained cold, unappetizing food.  Defendant Clark refused to pick up Plaintiff's outgoing mail, despite Plaintiff's kites requesting to send out his mail.

Plaintiff claims that Defendants Isard and LaLonde are responsible for conducting security classification reviews in segregation, and that the failure to have a third person as part of the review violates MDOC policy.  On June 15, 2015, during an SCC (Security Classification Committee) meeting, Defendant LaLonde told Plaintiff that he was being transferred to another facility because he had written so many grievances on so many staff members, that "they couldn't all be true."  Defendant LaLonde feared that staff would retaliate against Plaintiff by doing something to harm Plaintiff or by planting something in Plaintiff's cell.  Plaintiff asserts that Defendant LaLonde told him that "I see Inspector Hubbard wrote you a class II ticket for writing a grievance on Mr. Pawlie, I've never seen this behavior from Inspector Hubbard so you have to go!"  And a few days later, Plaintiff was transferred to the Oaks Correctional Facility (ECF).

Plaintiff claims that on June 25, 2015, while at ECF, he met with SCC members Defendants Holden, Ball, and Thomas.  Defendant Thomas asked Plaintiff if he was transgender, and Plaintiff stated that he was not and did not receive any special treatment.  Defendant Thomas told Plaintiff that he thought that Plaintiff was too different to take showers with the rest of the inmate population.  Later that day, Plaintiff told Defendant Holden that he was not GID (gender identity disorder) status or transgender and that Defendant Thomas' decision to have Plaintiff

-10-

shower alone violates his rights.  Plaintiff asserts that no other inmates are being treated in this manner.

Plaintiff also complains that while at URF and ECF, he was placed on modified access to the grievance procedure for writing too many valid grievances.  Plaintiff states that this is done to derail lawsuits.  Plaintiff asserts that Defendant Russell is also part of the conspiracy, and that grievances sent to his office are lost to protect co-workers.

Plaintiff further states that there is a conspiracy in the MDOC to prevent homosexual prisoners from getting prison jobs or from participating in educational programs which are needed to become eligible for parole.  Plaintiff states that while he was confined at ECF, a threatening letter was sent to administration regarding Plaintiff, so Defendants Thomas and Holden had Plaintiff placed in segregation.  Plaintiff sought to be placed in protective custody, but Defendant Holden refused, stating that if she had her way, every openly gay prisoner in the MDOC would go straight to level 5, even if she had to make up a false reason to put them there.  Defendant Holden told Plaintiff that homosexuals are disruptive and disturb the "moral order of the compound."  Defendant Holden told Plaintiff that he had enough points to go to level 5, and Plaintiff responded that he had had those points for years, even when he was being confined in level 2.  Defendant Holden told Plaintiff that because he was a homosexual, he was unmanageable and had to go.

Plaintiff alleges that in November of 2015, while he was confined at the Ionia Correctional Facility (ICF), Defendant Richardson ordered Plaintiff to submit to a strip search because he wanted to see if Plaintiff "had a dick or a pussy."  Plaintiff protested and Defendant Richardson told him that he would not be given his incentive television if he did not submit to the search.  Plaintiff complied, but subsequently wrote a grievance on this issue, but he never received

a grievance response.  Plaintiff sent a complaint to the Inspector, and was transferred to the Baraga Correctional Facility (AMF) the next day.

Plaintiff claims that the MDOC Mental Health Services has consistently refused to provide him with necessary treatment.  Plaintiff states that while he was incarcerated in California, he was diagnosed as having bi-polar disorder.  Plaintiff was treated with Abilify, Celexa, and other medications for years.  When Plaintiff entered the MDOC, he told the psychiatrist about his mental health history, and gave permission for the MDOC to get his records for the California DOC. Plaintiff asserts that mental health officials in the MDOC cater to "gang bangers," who sell psychiatric drugs to other inmates, but that prisoners with proven mental health issues are not given any assistance.

Plaintiff claims that Defendants Theut and Maki are a part of the conspiracy to push a homophobic, racist agenda by finding prisoners guilty of misconduct tickets, despite the lack of evidentiary support.  Plaintiff states that Defendant Maki found him guilty of sexual misconduct merely because Plaintiff admitted that he was homosexual.  Plaintiff was found guilty of wearing petroleum jelly on his lips in the winter, and of wearing makeup, despite the fact that no makeup was ever discovered.  Plaintiff states that inmates who hide their homosexuality are treated better than inmates, like himself, who are openly gay.

Plaintiff states that Defendants' conduct violated his right to be free from retaliation and discrimination, and constituted cruel and unusual punishment.  Plaintiff seeks damages, costs, and equitable relief.

II.    <u>Failure to state a claim</u>

-12-

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal

-13-

rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Plaintiff fails to make specific factual allegations against Defendants Goings, Hough, Connie, Woods, Barber, Brown, Bassett, Mackie, Ball, and Russell, other than his claim that some of these Defendants failed to conduct an investigation in response to his grievances. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575-76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Plaintiff has failed to allege that Defendants Goings, Hough, Connie, Woods, Barber, Brown, Bassett, Mackie, Ball, and Russell engaged in any active unconstitutional behavior. Accordingly, he fails to state a claim against them.

Plaintiff claims that Defendants Theut and Maki violated his rights when they improperly found him guilty of misconduct tickets. The Sixth Circuit, recognizing that a Michigan hearings officer has adjudicatory functions spelled out by statute in the nature of an administrative

-14-

law judge, has held that hearings officers are entitled to absolute judicial immunity from damages in relation to actions within the officer's authority. *Shelly v. Johnson*, 849 F.2d 228, 229 (6th Cir. 1988); MICH. COMP. LAWS §§ 791.251-255. *See also Williams v. McGinnis*, Nos. 02-1336, 02-1837, 2003 WL 245352, at *2 (6th Cir. Jan. 31, 2003) (recognizing that Michigan's prison hearings officers are entitled to absolute immunity); *Thompson v. Mich. Dep't of Corr.*, No. 01-1943, 2002 WL 22011, at *1 (6th Cir. Jan. 2, 2002) (same); *Gribble v. Bass*, No. 93-5413, 1993 WL 524022, at *2 (6th Cir. Dec. 16, 1993) (same). Plaintiff's action fails because Defendants Theut and Maki are absolutely immune from suit for damages under the circumstances of this case.

Moreover, injunctive relief is not available under § 1983, because, under the 1996 amendments to that statute, injunctive relief "shall not be granted" in an action against "a judicial officer for an act or omission taken in such officer's judicial capacity . . . unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983; *accord Savoie v. Martin*, 673 F.3d 488, 496 (6th Cir. 2012). Plaintiff does not allege that a declaratory decree was violated or that declaratory relief was unavailable. Consequently, any claim for injunctive relief against Defendants Theut and Maki is barred. *Montero v. Travis*, 171 F.3d 757, 761 (2d Cir. 1999).

Plaintiff claims that Defendants Gurnoe, Seimes, Myron, Lancor, Lindenmuth, Payment, Hall, Beavlev, and Sellick called him names and verbally harassed him on the basis of his sexual orientation and race in violation of his Eighth Amendment rights. The use of harassing or degrading language by a prison official, although unprofessional and deplorable, does not rise to constitutional dimensions. *See Ivey v. Wilson*, 832 F.2d 950, 954-55 (6th Cir. 1987); *see also Johnson v. Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004) (harassment and verbal abuse do not constitute the type of infliction of pain that the Eighth Amendment prohibits); *Violett v. Reynolds,*

-15-

No. 02-6366, 2003 WL 22097827, at *3 (6th Cir.  Sept. 5, 2003) (verbal abuse and harassment do not constitute punishment that would support an Eighth Amendment claim); *Thaddeus-X v. Langley*, No. 96-1282, 1997 WL 205604, at *1 (6th Cir. Apr. 24, 1997) (verbal harassment is insufficient to state a claim); *Murray v. U.S. Bureau of Prisons*, No. 95-5204, 1997 WL 34677, at *3 (6th Cir. Jan. 28, 1997) ("Although we do not condone the alleged statements, the Eighth Amendment does not afford us the power to correct every action, statement or attitude of a prison official with which we might disagree."); *Clark v. Turner*, No. 96-3265, 1996 WL 721798, at *2 (6th Cir. Dec. 13, 1996) ("Verbal harassment and idle threats are generally not sufficient to constitute an invasion of an inmate's constitutional rights."); *Brown v. Toombs*, No. 92-1756, 1993 WL 11882 (6th Cir. Jan. 21, 1993) ("Brown's allegation that a corrections officer used derogatory language and insulting racial epithets is insufficient to support his claim under the Eighth Amendment.").  Accordingly, Plaintiff fails to state an Eighth Amendment claim against Defendants Gurnoe, Seimes, Myron, Lancor, Lindenmuth, Payment, Hall, Beavlev, and Sellick arising from their alleged verbal abuse.

In its prohibition of "cruel and unusual punishments," the Eighth Amendment places restraints on prison officials, directing that they may not use excessive physical force against prisoners and must also "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984)). To establish liability under the Eighth Amendment for a claim based on a failure to prevent harm to a prisoner, plaintiffs must show that the prison officials acted with "deliberate indifference" to a substantial risk that the defendant would cause prisoners serious harm. *Farmer,* 511 U.S. at 834; *Helling v. McKinney*, 509 U.S. 25, 32 (1993); *Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir.

1997); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996); *Taylor v. Mich. Dep't of Corr.* 69 F.3d 76, 79 (6th Cir. 1995).  *See Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001).

Inmates have a constitutionally protected right to personal safety grounded in the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).  Thus, prison staff are obliged "to take reasonable measures to guarantee the safety of the inmates" in their care.  *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984).  To establish a violation of this right, Plaintiff must show that Defendant was deliberately indifferent to the Plaintiff's risk of injury.  *Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990); *McGhee v. Foltz*, 852 F.2d 876, 880-81 (6th Cir. 1988).  While a prisoner does not need to prove that he has been the victim of an actual attack to bring a personal safety claim, he must at least establish that he reasonably fears such an attack.  *Thompson v. County of Medina, Ohio*, 29 F.3d 238, 242-43 (6th Cir. 1994) (holding that plaintiff has the minimal burden of "showing a sufficient inferential connection" between the alleged violation and inmate violence to "justify a reasonable fear for personal safety.")

Plaintiff claims that Defendant Myron paid his cellmate, inmate Simms, to attack him and that Defendant Lancor failed to move Plaintiff out of the cell after he told Defendant Lancor of inmate Simms hostility toward Plaintiff.  The Court concludes that this claim is not clearly frivolous and may not be dismissed on initial review.  In addition, Plaintiff's Eighth Amendment claims against Defendants Sellick and Payment for knowingly assigning Plaintiff to a cell with inmate Shelton, who had previous assaulted Plaintiff, and against Defendants Watson and Dunton for attempting to force Plaintiff to share the cell with inmate Shelton are not clearly frivolous and may not be dismissed on initial review.

-17-

Plaintiff claims that Defendant Richardson violated his Eighth Amendment rights whe he coerced Plaintiff into submitting to a strip search so that he could see whether Plaintiff had male or female genitalia.  Plaintiff also alleges that Defendants Myron, Lancor, and Lindenmuth bought him bras and told him to wear them or be sent to segregation.  "[B]ecause the sexual harassment or abuse of an inmate by a corrections officer can never serve a legitimate penological purpose and may well result in severe physical and psychological harm, such abuse can, in certain circumstances, constitute the 'unnecessary and wanton infliction of pain' forbidden by the Eighth Amendment."  *Freitas v. Ault*, 109 F.3d 1335, 1338 (8th Cir. 1997) (quoted cases omitted). However, circuit courts consistently have held that sexual harassment, absent contact or touching, does not satisfy the objective requirement because such conduct does not constitute the unnecessary and wanton infliction of pain.  *See Morales v. Mackalm*, 278 F.3d 126, 132 (2d Cir. 2002) (allegations that prison guard asked prisoner to have sex with her and to masturbate in front of her and other female staffers did not rise to level of Eighth Amendment violation); *Barney v. Pulsipher*, 143 F.3d 1299, 1311 n.11 (10th Cir. 1998) (allegations that county jailer subjected female prisoners to severe verbal sexual harassment and intimidation was not sufficient to state a claim under the Eighth Amendment); *Howard v. Everett*, No. 99-1277EA, 2000 WL 268493, at *1 (8th Cir. March 10, 2000) (sexual comments and gestures by prison guards did not constitute unnecessary and wanton infliction of pain); *cf. Seltzer-Bey v. Delo*, 66 F.3d 961, 962-63 (8th Cir. 1995) (allegations that prison guard conducted daily strip searches, made sexual comments about prisoner's penis and buttocks, and rubbed prisoner's buttocks with nightstick were sufficient to withstand motion for summary judgment); *Zander v. McGinnis*, No. 97-1484, 1998 WL 384625, at *2 (6th Cir. June 19, 1998) (verbal abuse of mouthing "pet names" at prisoner for ten months failed to state an Eighth

-18-

Amendment claim); *Murray v. United States Bureau of Prisons*, No. 95-5204, 1997 WL 34677, at *3 (6th Cir. Jan. 28, 1997) (magistrate judge correctly held that verbal abuse in the form of offensive remarks regarding a transsexual prisoner's bodily appearance, transsexualism, and presumed sexual preference cannot state an Eighth Amendment claim). Some courts have held that even minor, isolated incidents of sexual touching coupled with offensive sexual remarks do not rise to the level of an Eighth Amendment violation. *See, e.g., Solomon v. Mich. Dep't of Corr.*, 478 F. App'x 318, 320-21 (6th Cir. 2012) (two "brief" incidents of physical contact during pat-down searches, including touching and squeezing the prisoner's penis, coupled with sexual remarks, do not rise to the level of a constitutional violation); *Jackson v. Madery,* 158 F. App'x 656, 661 (6th Cir. 2005) (correction officer's conduct in allegedly rubbing and grabbing prisoner's buttocks in degrading manner was "isolated, brief, and not severe" and so failed to meet Eighth Amendment standards); *Johnson v. Ward*, No. 99-1596, 2000 WL 659354, at *1 (6th Cir. May 11, 2000) (male prisoner's claim that a male officer placed his hand on the prisoner's buttock in a sexual manner and made an offensive sexual remark did not meet the objective component of the Eighth Amendment); *Berryhill v. Schriro*, 137 F.3d 1073, 1075 (8th Cir. 1998) (where inmate failed to assert that he feared sexual abuse, two brief touches to his buttocks could not be construed as sexual assault); *accord Boxer X v. Harris,* 437 F.3d 1107, 1111 (11th Cir. 2006); *Boddie v. Schneider*, 105 F.3d 857, 859-61 (2d Cir. 1997) (court dismissed as inadequate prisoner's claim that female corrections officer made a pass at him, squeezed his hand, touched his penis, called him a "sexy black devil," pressed her breasts against his chest, and pressed against his private parts).

   If true, the conduct of Defendants Richardson, Myron, Lancor, and Lindenmuth toward Plaintiff was reprehensible, but it does not rise to the level of an Eighth Amendment

violation.  Plaintiff does not allege that Defendants Richardson, Myron, Lancor, and Lindenmuth ever touched him or engaged in any physical contact with him.  Acts of verbal sexual harassment, standing alone, are insufficient to state a claim under the Eighth Amendment.  *See Morales*, 278 F.3d at 132; *Zander*, 1998 WL 384625, at *2.  Therefore, Plaintiff's allegations fail to state an Eighth Amendment claim against Defendants Richardson, Myron, Lancor, and Lindenmuth.

Plaintiff claims that Defendant Gurnoe refused to move him from a cell where the paint on the walls had not yet dried, and where there was a strong paint smell.  Plaintiff alleges that he had no way of opening a window in order to get ventilation into the cell.  Plaintiff states that the smell gave him a headache and caused him to gag and vomit.  Plaintiff contends that his placement in the freshly painted cell was at the behest of Defendant Dunton and that he was kept in the cell for eleven days.

In extreme circumstances, courts have found that inadequate ventilation may result in a sufficiently serious risk to prisoner safety under the Eighth Amendment.  *See, e.g., White v. Monohan*, 326 F. App'x 385 (7th Cir. 2009) (reversing district court dismissal of claim alleging that inadequate ventilation permitted temperatures to reach 110 degrees during the summer months); *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004) (finding that the Eighth Amendment was violated by a ventilation system that allowed summer temperatures to average in the 90s, unless prison officials took measures to ameliorate the heat by providing fans, ice water and daily showers); *Keenan v. Hall*, 83 F.3d 1083 (9th Cir.1996) (allowing a prisoner's claim that his cell was "[s]aturated with the [f]umes of [f]eces (thrown by some inmates), the smell of urine and vomit as well as other stale body odors" to proceed).  However, absent such extreme conditions raising serious risks to prisoner health, courts routinely have determined that claims concerning ventilation were insufficient to state

-20-

an Eighth Amendment claim. *See, e.g., Vasquez v. Frank*, 290 F. App'x 927 (7th Cir. 2008) (holding that ventilation that allegedly caused dizziness, migraines, nasal congestion, nose bleeds and difficulty breathing did not rise to the level of an Eighth Amendment violation); *Chandler v. Crosby*, 379 F.3d 1278 (11th Cir. 2004) (citing cases and concluding that a ventilation system that allowed summer temperatures to average eighty-five or eighty-six degrees during the day and eighty degrees at night was not sufficiently extreme to violate the Eighth Amendment, where such temperatures were expected and tolerated by the general public in Florida); *Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004) (upholding the dismissal of a prisoner's claim that the confiscation of his extension cord, which was needed to operate a fan, deprived him of constitutionally adequate ventilation); *Bourrage v. McFarland*, No. 99-60923, 2001 WL 185034 (5th Cir. Feb. 6, 2001) (upholding dismissal of a prisoner's claim that inadequate ventilation had led to his prescription for an Albuterol Inhaler); *Jasman v. Schmidt*, 4 F. App'x 233, 235-36 (6th Cir. 2001) (affirming dismissal of a claim that the weatherstripping on the doors of the cells at a Michigan prison prevented air circulation and resulted in inadequate ventilation); *Davis v. Crowley*, No. 00-1475, 2000 WL 1871891 (6th Cir. Dec. 12, 2000) (concluding that a plaintiff's allegations that a ventilation system smelled strongly of gas did not allege a sufficiently serious harm where, despite his allegations that the fumes caused him to experience shortness of breath and watery eyes, the plaintiff failed to allege a substantial risk of serious harm); *Thompson v. County of Medina*, 29 F.3d 238 (6th Cir.1994) (upholding a dismissal of pretrial detainees' claim that a jail had inadequate ventilation); *King v. Berghuis*, No.1:10-cv-57, 2010 WL 565373, at *3 (W.D. Mich. Feb. 13, 2010) (dismissing prisoners' claim alleging that ventilation system moves less than 10 cubic feet of air and caused headaches).

In the instant case, Plaintiff fails entirely to allege that Defendants Gurnoe and Dunton have subjected them to an objectively serious deprivation. As the Supreme Court has observed, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson*, 503 U.S. at 9. Plaintiffs' allegations that he was subjected to exposure to paint fumes because he had been placed in a freshly painted cell for eleven days does not rise to the level of an Eighth Amendment violation. As noted above, courts have held that ventilation that causes dizziness, migraines, nasal congestion, nose bleeds, difficulty breathing, and watery eyes do not rise to the level of an Eighth Amendment violation. *Vasquez*, 290 F. App'x 927; *Davis*, 2000 WL 1871891. Therefore, Plaintiff's Eighth Amendment claims regarding his placement in the freshly painted cell are properly dismissed.

Plaintiff claims that Defendant Ross violated his Eighth Amendment rights when he prevented him from using the restroom for a period of three hours. In addition, Plaintiff states that Defendant Bigger failed to correct the issue after he told Plaintiff that he would do so if Plaintiff signed off on the grievance against Defendant Ross. The Court notes that in order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)). "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347). As a consequence, "extreme deprivations are required to make out a conditions-of-

confinement claim." *Id.* Plaintiff's inability to use the restroom for a three hour period does not rise to the level of an Eighth Amendment violation.

Plaintiff alleges that his right to access medical care was violated by Defendants Ernst and Bertram when he was told he had to stay on the top bunk despite his chest pains, and when he was told he had to walk to health care by going outside the unit and walking through a blizzard. The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 898 (6th Cir. 2004), the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more

than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

In this case, Plaintiff claims that he received a misconduct ticket for being out of place after he got off the top bunk, and that he had to walk to health services in order to obtain treatment for his chest pain. Plaintiff's allegations fail to show that he was actually denied medical care. Therefore, Plaintiff's allegations against Defendants Ernst and Bertram fail to support an Eighth Amendment claim.

Finally, Plaintiff claims that he was denied mental health care during his confinement in the MDOC. The Eighth Amendment requires prison officials to provide medically necessary mental health treatment to inmates. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Government of the Virgin Islands v. Martinez*, 239 F.3d 293, 301 (3d Cir. 2001); *Lay v. Norris*, No. 88-5757, 1989 WL 62498, at *4 (6th Cir. June 13, 1989); *Potter v. Davis*, No. 82-5783, 1985 WL 13129, at * 2 (6th Cir. April 26, 1985). However, Plaintiff fails to allege any specific allegations of wrongdoing on behalf of any of the named Defendants. Therefore, this claim is properly dismissed.

Plaintiff claims that Defendant Clark refused to pick up his outgoing legal mail on June 9, 2015. In *Bounds v. Smith*, 430 U.S. 817 (1977), the Supreme Court recognized a prisoner's fundamental right of access to the courts. While the right of access to the courts does not allow a State to prevent an inmate from bringing a grievance to court, it also does not require the State to enable a prisoner to discover grievances or litigate effectively. *Lewis v. Casey*, 518 U.S. 343 (1996). Thus, *Bounds* did not create an abstract, free-standing right to a law library, litigation tools, or legal

assistance. *Id.* at 351 (1996). Further, the right may be limited by legitimate penological goals, such as maintaining security and preventing fire or sanitation hazards. *See Acord v. Brown*, No. 91-1865, 1992 WL 58975 (6th Cir. March 26, 1992); *Hadix v. Johnson*, No. 86-1701, 1988 WL 24204 (6th Cir. March 17, 1988); *Wagner v. Rees*, No. 85-5637, 1985 WL 14025 (6th Cir. Nov. 8, 1985).

In order to state an access to courts claim under the First Amendment, an inmate must make a specific claim that he was adversely affected or that the litigation was prejudiced. *Harbin-Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005); *Vandiver v. Niemi*, No. 94-1642, 1994 WL 677685, at *1 (6th Cir. Dec. 2, 1994). "Examples of actual prejudice to pending or contemplated litigation include having a case dismissed, being unable to file a complaint, and missing a court-imposed deadline." *Harbin-Bey*, 420 F.3d at 578 (citing *Jackson v. Gill*, 92 F. App'x 171, 173 (6th Cir. 2004)). Because Plaintiff has not made such a showing, his claim against Defendant Clark is properly dismissed.

Plaintiff claims that numerous Defendants retaliated against him in a variety of ways. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Plaintiff claims that Defendants Gurnoe and Dunton retaliated against him by exposing him to paint fumes in retaliation for filing grievances on Defendant Dunton. The filing of a prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); *Hall v. Nusholtz*, No. 99-2442, 2000 WL 1679458, at *2 (6th Cir. Nov. 1, 2000); *Burton v. Rowley*, No. 00-1144, 2000 WL 1679463, at *2 (6th Cir. Nov. 1, 2000). Plaintiff specifically alleges that Defendant Gurnoe told him that he deserved to die from paint fumes because of all the grievances he had written on Defendant Dunton. The Court concludes that this claim is not clearly frivolous and may not be dismissed on initial screening.

Plaintiff alleges that Defendants Ross, Bigger, Russo, and Pawley conspired to retaliate against him for grievances that Plaintiff had filed on Ross by writing false tickets on Plaintiff. Plaintiff states that Defendant Ross told him that he should rip out Plaintiff's tongue and piss down his throat because of the grievance. Defendant Bigger was present and laughed. Defendant Ross wrote a ticket on Plaintiff the next day. When Defendant Pawley reviewed the ticket with Plaintiff, he told Plaintiff that staff could do whatever they wanted to frame Plaintiff and that he could have Plaintiff placed in segregation for looking at him the wrong way. Defendant Pawley subsequently wrote a ticket on Plaintiff and had Plaintiff moved to unit 4 instead of segregation. Plaintiff was found not guilty of the misconduct.

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)). The plaintiff must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial

objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff. *Hensley*, 693 F.3d at 695; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). Moreover, a plaintiff must plead a conspiracy with particularity, as vague and conclusory allegations unsupported by material facts are insufficient. *Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one); *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987). The Court concludes that Plaintiff's claim that Defendants Ross, Bigger, Russo, and Pawley conspired to retaliate against him for grievances that Plaintiff had filed on Ross is not clearly frivolous and may not be dismissed on initial screening.

Plaintiff claims that Defendants Isard and LaLonde had him transferred from URF to ECF because of Plaintiff's use of the grievance system. Defendant LaLonde told Plaintiff that he was being transferred because of all the grievances he had written on staff. Defendant LaLonde also stated, "I see Inspector Hubbard wrote you a class II ticket for writing a grievance on Mr. Pawlie, I've never seen this behavior from Inspector Hubbard so you have to go!" As noted above, filing a grievance is constitutionally protected conduct under the First Amendment. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); *Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir. 1996). Plaintiff, however, cannot show that his transfer to ECF was an adverse action for purposes of the First Amendment. "Since prisoners are expected to endure more than the average citizen, and since transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct." *Siggers-El v. Barlow*, 412 F.3d 693, 701

(6th Cir. 2005). *See, e.g., Smith v. Yarrow*, 78 F. App'x. 529, 543 (6th Cir. 2003) ("transfer from one prison to another prison cannot rise to the level of an adverse action because it would not deter a person of ordinary firmness from the exercise of his First Amendment rights") (internal quotation marks omitted). If, however, a foreseeable consequence of a transfer would be to substantially inhibit a prisoner's ability to access the courts, then such a transfer could be considered an "adverse action" that would deter a person of ordinary firmness from continuing to engage in the protected conduct. *See Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010) (holding that transfer to administrative segregation or another prison's lock-down unit or can be sufficient to constitute adverse action); *Siggers-El*, 412 F.3d at 702 (holding that a transfer was an "adverse action," where the transfer resulted in plaintiff losing a high paying job that paid for his lawyer fees and moved him further from the attorney); *Johnson v. Beardslee*, No. 1:06-CV-374, 2007 WL 2302378, at *5 (W.D. Mich. Aug. 8, 2007). Similarly, the Sixth Circuit has held that a transfer to segregation or to an area of the prison used to house mentally disturbed inmates could be sufficiently adverse. *See Thaddeus-X*, 175 F.3d at 398; *see also Hill*, 630 F.3d at 468.

Plaintiff fails to allege that his transfer inhibited his access to the courts, resulted in a higher security level, or caused him to be placed in a unit with mentally disturbed inmates. Transfers to the general population of another prison are not typically an adverse action. *See Smith v. Yarrow*, 78 F. App'x 529, 543 (6th Cir. 2003) (collecting cases); *see also Hill*, 630 F.3d at 473; *Thaddeus-X*, 175 F.3d at 398. Therefore, Plaintiff's retaliation claims against Defendants Isard and LaLonde are properly dismissed.

Plaintiff claims that Defendant Sellick violated his due process rights by improperly taking his coffee mugs, thermals, a shirt, a tupperware bowl, and several food items. Plaintiff's due

process claim is barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986). Under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law." *Parratt*, 451 U.S. at 537. This rule applies to both negligent and intentional deprivation of property, as long as the deprivation was not done pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984). Because Plaintiff's claim is premised upon allegedly unauthorized acts of a state official, he must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993). Under settled Sixth Circuit authority, a prisoner's failure to sustain this burden requires dismissal of his § 1983 due-process action. *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

Plaintiff has not sustained his burden in this case. Plaintiff has not alleged that state post-deprivation remedies are inadequate. Moreover, numerous state post-deprivation remedies are available to him. First, a prisoner who incurs a loss through no fault of his own may petition the institution's Prisoner Benefit Fund for compensation. MICH. DEP'T OF CORR., Policy Directive 04.07.112, ¶ B (effective Dec. 12, 2013). Aggrieved prisoners may also submit claims for property loss of less than $1,000 to the State Administrative Board. MICH. COMP. LAWS § 600.6419; MDOC Policy Directive 03.02.131 (effective Oct. 21, 2013). Alternatively, Michigan law authorizes actions in the Court of Claims asserting tort or contract claims "against the state and any of its departments, commissions, boards, institutions, arms, or agencies." MICH. COMP. LAWS § 600.6419(1)(a). The Sixth Circuit specifically has held that Michigan provides adequate post-deprivation remedies for

deprivation of property.  *See Copeland*, 57 F.3d at 480.  Plaintiff does not allege any reason why a state-court action would not afford him complete relief for the deprivation, either negligent or intentional, of his personal property.  Accordingly, Plaintiff's due process claim against Defendant Sellick will be dismissed.

Plaintiff claims that Defendant McLean deliberately interfered with Plaintiff's ability to file grievances by losing the majority of the grievances that Plaintiff filed.  Plaintiff has no due process right to file a prison grievance.  The courts repeatedly have held that there exists no constitutionally protected due process right to an effective prison grievance procedure.  *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy*, 30 F. App'x 568, 569-70 (6th Cir. 2002); *Carpenter v. Wilkinson*, No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases).  Michigan law does not create a liberty interest in the grievance procedure.  *See Olim v. Wakinekona*, 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994).  Because Plaintiff has no liberty interest in the grievance process, Defendant McLean's conduct did not deprive him of due process.

Finally, Plaintiff claims that he was repeatedly discriminated against on the basis of his race and sexual preference.  The Equal Protection Clause commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  A state practice generally will not require strict scrutiny unless it interferes with a fundamental

right or discriminates against a suspect class of individuals. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976).

For legislation which burdens the interests of homosexuals, the lowest level of scrutiny, or the "rational relationship" test, is appropriate. *Romer v. Evans*, 517 U.S. 620, 632 (1996); *Equal. Found. of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289, 294 (6th Cir. 1997); *see also Gay Inmates of Shelby County Jail/Criminal Justice Complex v. Barksdale*, No. 84-5666, 1987 WL 37565, at *3 (6th Cir. June 1, 1987) (applying rational basis test to a sexual orientation classification in a prison). In the context of prisons, the regulation, policy or practice must be "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). However, when a law adversely impacts a "suspect class" such as one defined by race, alienage, or national origin, or invades a "fundamental right" such as speech or religious freedom, the rigorous "strict scrutiny" standard ordinarily governs, whereby such laws "will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne*, 473 U.S. at 440. However, while a convicted prisoner does not forfeit all constitutional protections by virtue of his confinement, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights . . . ." *Price v. Johnston*, 334 U.S. 266, 285 (1948). "The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives – including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citing, *inter alia*, *Turner v. Safley*, 482 U.S. 78, 84 (1987)).

In this case, Plaintiff claims that Defendants Ernst, Sellick, Payment, Gurnoe, Anderson, Beavlev, Hall, Myers, and Lacrosse all refer to all black inmates as "niggers, jiggaboos,

sambos, and porch monkeys," and have been overheard discussing how "niggers" should be shipped to their own island.  Plaintiff claims that Defendants Ernst, Bertram, and Bigger openly competed to see who could write the most tickets on black inmates.  In addition, Plaintiff heard Defendants Ernst and Bertram talking about all the fags on the unit, including Plaintiff, and how Defendant Seimes hoped that Plaintiff would kill himself.  Plaintiff alleges that Defendants Pawley and Payment regularly plant contraband in the cells of black inmates.  On one occasion, Defendant Hall made Plaintiff leave the chow hall as soon as he sat down with his tray, telling him that he could go hungry that night.

The Court notes that an allegation that a prison official used racial slurs, standing alone, does not violate the Fourteenth Amendment's guarantee of equal protection.

> However, Plaintiff's allegations of verbal harassment and abusive language do not give rise to an equal protection claim.  *Jones v. Porter*, No. 99-1326, 2000 WL 572059 (6th Cir., May 1, 2000) ("Jones's Fourteenth Amendment equal protection claim is without merit, as a prison official's verbal harassment or idle threats do not rise to a constitutional level.") (citing *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987); *Price v. Lighthart*, No. 1:10-cv-265, 2010 WL 1741385 (W.D. Mich. Apr. 28, 2010) (finding that an allegation that a prison official used racial slurs, standing alone, does not violate the Fourteenth Amendment's guarantee of equal protection) (citing *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1013, n. 61 (5th Cir. 2003)).  The complaint contains no allegations that Plaintiff was subjected to a denial or deprivation in violation of the Equal Protection Clause. As such, the complaint fails to state an Equal Protection Clause claim.

*Montgomery v. Harper*, No. 5:14 cv-P38R, 2014 WL 4104163, at *2 (W.D. Ky. Aug. 19, 2014).  In this case, Plaintiff fails to allege that Defendants Ernst, Payment, Gurnoe, Anderson, Beavlev, Myers, Bertram, Seimes, Pawley, and Lacrosse did anything more than use racial and homophobic slurs with regard to Plaintiff.  Plaintiff fails to allege facts showing that Defendants Ernst, Payment,

Gurnoe, Anderson, Beavlev, Myers, Bertram, Seimes, Pawley, and Lacrosse intentionally treated him differently from white heterosexual prisoners on the basis of his status as a black homosexual. Therefore, Plaintiff's equal protection claims against these Defendants are properly dismissed.

However, Plaintiff claims that Defendants Sellick and Hall did take additional action against him on the basis of his race and sexual identity. Plaintiff alleges that Defendant Sellick referred to him as a "fuckin' transgender" and wrote a misconduct ticket on him for having the top two buttons of his shirt undone. In addition, Plaintiff alleges that Defendant Hall actually denied him the opportunity to eat his meal after calling Plaintiff a "fag ass nigger" and telling Plaintiff to go kill himself. Therefore, the Court concludes that Plaintiff's equal protection claims against Defendants Hall and Sellick are nonfrivolous and may not be dismissed on initial review.

Plaintiff claims that Defendants Holden and Thomas had Plaintiff placed in segregation because he was a homosexual. Defendant Holden told Plaintiff that if she had it her way, all openly gay prisoners would be in level 5 custody, and that homosexuals are disruptive and disturb the moral order of the compound. Defendant Holden told Plaintiff that because he was a homosexual, he was unmanageable and had to go. Therefore, the Court concludes that Plaintiff's equal protection claims against Defendants Holden and Thomas are nonfrivolous and may not be dismissed on initial review.

In conclusion, the Court finds that Plaintiff's Eighth Amendment failure to protect claims against Defendants Myron, Lancor, Sellick, Payment, Watson, and Dunton, his First Amendment retaliation claims against Defendants Gurnoe, Dunton, Ross, Bigger, Russo, and Pawley, and his Fourteenth Amendment equal protection claims against Defendants Sellick, Hall, Holden and Thomas are not clearly frivolous and may not be dismissed on initial review. However,

the remainder of the claims asserted in Plaintiff's complaint will be dismissed for failure to state a claim. Therefore, the Court will serve the complaint against Defendants Myron, Lancor, Sellick, Gurnoe, Payment, Russo, Holden, Thomas, Watson, Ross, Pawley, Bigger, Dunton, and Hall, and dismiss the rest of the named Defendants with prejudice.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Ernst, Bertram, Lacrosse, Anderson, Hough, Connie, McLean, Horton, Woods, Barber, Myers, Seimes, Beavlev, Goings, Brown, Ball, Bassett, Mackie, Theut, Russell, LaLande, Isard, Maki, Lindenmuth, Clark, Richardson, Doolittle, and Patel will be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court will serve the complaint against Defendants Myron, Lancor, Sellick, Gurnoe, Payment, Russo, Holden, Thomas, Watson, Ross, Pawley, Bigger, Dunton, and Hall.

An Order consistent with this Opinion will be entered.

Date: <u>September 26, 2016</u>                  <u>/s/ Robert Holmes Bell</u>
ROBERT HOLMES BELL
UNITED STATES DISTRICT JUDGE